Good morning, sir. My name is Ruben Salter, Jr., and I am the only attorney that the Fisher plaintiffs had in this matter. Tucson attempted to desegregate the school 60 years ago. I filed a lawsuit 40 years ago. We ended up with a desegregation settlement agreement 30 years ago. And we're here today because apparently Judge Burry, in his decision to get rid of this case that's so old on the calendar, he says, I want you to file a petition to become unitary. Burry, in my opinion, accurately set out the standards that he was going to use. He clearly was aware of Dowell, Freeman, and Green. And he says, that's your margin on this. After poring over all the testimony, Judge Burry made specific findings that were required in those three cases. And what he did was he found findings of facts, and then he issued conclusions of law that were not supported by the findings of facts. He found that the district, over the period of time, had not acted in good faith. And then he proceeded to order the district to come up with a unitary plan. He then said in that plan, I want that plan to have certain things. I want transparency. I want accountability. And I want the plan to be committed by the committee itself, not the school district submitting a plan. We contend in the record, we've shown you in the record, that even in submitting the plan, the district still did not act in good faith, and the plan itself does not assure in the future that the district will act in good faith. But for whatever reason, Judge Burry decided to end this case. He left, after these findings, no oversight. He approved a plan that had disagreed with his procedures for providing for this plan. He says, I want it to be by the committee. The school board itself then, which to me indicates the need for continued judicial oversight, the school board says that we don't like this. We want to put in a clause where, with some notice, we can change, unilaterally change, this plan. I think that is wrong. This plan itself is so flawed that, to my knowledge, it has not even been implemented today. I don't believe there's anything that has been done in this plan today. So I'm saying, one, Judge, from the Fisher standpoint, and we are the black plaintiffs, we believe, and I think the other parties will also concur, that Judge Burry had no basis, based upon his findings, to conclude that the district is unitary, and he certainly had no precedent or law to suggest that there should not be some judicial oversight. The plan itself is flawed, as far as the blacks are concerned. It does nothing to correct the past and nothing to show that, in the future, it will not again cause resegregation of the district, and it does not address achievement, hiring, promotions, things that Judge Burry said he wanted to see. So I'm going to reserve my time. It's pretty clear, then, to make a summation here that, one, Judge Burry finding that the district was not acting in good faith or had not acted in good faith, it was correct under the analysis of the cases that he said he was going to follow, and, number two, that it was premature. There never should have been a finding of unitary status. If that is the case, there is no need, at this stage, for a post-unitary status plan. And, finally, if this Court should decide that, somehow, in spite of all the facts, Judge Burry was partially correct, it should be sent back for judicial oversight, because there are no benchmarks. There's nothing for which anyone can tell that the district and the plan is doing what it should be. Thank you. Thank you, Counsel. We'll hear from the United States. Oh, I'm sorry. You're going to go second? Yes. All right. Very good. But I'm honored to be associated with the United States. Yes, very good. My name is Lois Thompson, and together with Nina Perales, who's the Director of Litigation for the Mexican-American Legal and Educational Fund, I'm here today on behalf of approximately 30,000 Latino students in the Tucson Uniform School District, who today comprise about 56 percent of the student body of that school district. And what I'd like to do is really focus on one aspect of the so-called post-unitary status plan as it relates to those students and student assignment. I also just want to very quickly mention the fact that we do still have pending a motion to strike the district's fourth brief on cross-appeal. But I'm going to argue with that motion obviously unresolved at this point. Of the green factors, student assignment is pivotal. Student assignment is the factor by which students are brought into racially diverse schools and programs. Student assignment is the green factor that can, and I emphasize can't, make desegregated education a practical reality in a school district. And when we look at the Tucson School District and what happened here and why it is so important that this Court find that continued court supervision is essential, is that we have what's sometimes referred to as a majority-minority school district, a school district that today is comprised of about 70 percent of minority students. We also have a school district that from the very beginning took as the center of desegregation effort in Tucson voluntary desegregation, that in theory it would create magnet schools and other programs and use other resources to encourage individual parents and students to make voluntary choices, to go to schools that would be racially diverse. What we also know about the Tucson school system is that many parents and students elected to move from their home school district, their neighborhood school, to other schools. The record indicates that approximately one-third of the students in this school district moved to schools other than their home districts. And yet the record also shows abundantly that there are a significant number of schools within this district which are racially isolated and have a disproportionate number of minority students, while there are a number of schools that are identifiably Anglo because they have a lesser number of minority students and a greater number relatively speaking of Anglo students. Given all of this, it's up to minority students assigned to racially isolated schools to act one at a time, to choose and then get to more integrated schools. And the thrust of the student assignment plan that was crafted on an interim basis and interim is very important here, really was to address that challenge. The plaintiffs and frankly the school district were benefited in this case by the assistance of two particularly able experts. Gary Orfield, who volunteered his time, who's a professor currently of education at the UCLA Law School and head of its project on civil rights, who was formerly at Harvard Law School, and Leonard Stevens, who was the special monitor for the Cleveland schools and who has testified and worked in approximately 30 integration cases. And there were two components of the assignment plan that, given what I just said, were critical, that it was important to design a system in which minority students would choose to move to more integrated schools and they would be able to get there, so that the interim plan has within it an approach which says we are going to retain an outside consultant, an expert on marketing, particularly qualified to provide guidance on how best to provide information on choice. We're going to have home visits to provide parents with options so that they can choose and understand what they're choosing. And we're going to facilitate all of this by training marketing experts and also having community groups involved. And we are going to provide transportation so that students who are in a group of schools that are disproportionately minority and, by the way, also are disproportionately free lunch schools and, unfortunately, disproportionately schools in which students are doing less well, and schools in which there are the greatest number, relatively speaking, of students who come from homes in which English is not their first language. And we're going to provide them, after this marketing effort, with transportation so that they can go to the schools that we've grouped that are relatively better on the scales of achievement and have relatively more Anglo students. And we're going to do this for two years. And while this is happening, what we are also going to do is carefully study our magnet schools, because the magnet is really intended to be a magnet in this case and to pull children into schools that they might not otherwise attend. But we need to understand that we're starting with many of these magnet schools in neighborhoods that are disproportionately minority and, by virtue of the attendance zones, are heavily minority. And we need to figure out how to deal with these magnets. All of that was to have happened, and then, within two years, after looking at all of the information, the magnet program to be analyzed by June 1910, outside marketing, expertise, and transportation, the district was then to develop, with the assistance of the so-called post-unitary plan committee, a, quote-unquote, permanent Simon plan. And when we filed our briefs, we asked the Court to reverse and hold that it was essential for the district to continue to have court supervision while all of this went forward. Now, excuse me, unfortunately, there is now more that we need to ask this Court to do, because, as Mr. Salter said quickly in his argument, and which is unfortunately abundantly true, the plan was adopted by the governing board in the end of 2009. We are now a year and a half later. During that period of time, little has happened. The magnet program has not been studied. The work is only now beginning to gather data on what is happening with respect to the transportation. No meaningful marketing program ever was embarked on. So that what we have here, and I do want to reserve some time for rebuttal, is a circumstance in which, unfortunately, a school district which the district court found had not shown a good-faith commitment to the principles of desegregation, but whom the Court nonetheless released from court supervision, has in the last year and a half failed to demonstrate that sort of commitment to the plan that it adopted, and we find ourselves in a situation where there has been no showing of good faith. There continue to be the vestiges of discrimination. Are you challenging the withdrawal of supervision and the adoption of a plan at a time when the Court had found that in the past there had been bad faith? So it's sort of a prospective order which you say was not justified by the facts. Are you challenging the plan itself? We are not, and that makes this case very unusual, because we think that at some point in time, fairy dust touched this district, and that it managed, with the assistance of representatives of the parties and the experts, to craft what could be a workable plan. If implemented and if monitored. Exactly. Exactly. That's precisely our point. I'll reserve the rest for rebuttal. Thank you. Now we'll hear from the government. Good morning. May it please the Court. My name is Holly Thomas, and I represent the United States. The Supreme Court has never wavered from the principles set forth in its decisions in Green, Dowell, and Freeman that before a district court can relinquish its jurisdiction over a desegregation decree, it must make three findings. First, it must find that a school district has acted in good faith compliance both with the entirety of the desegregation decree and with the district court's orders. The court needs to find that a school district has demonstrated its commitment to the legal and constitutional principles that were a predicate for district court involvement, and the district court must find that the vestiges of discrimination have been eliminated to the extent practicable. In this case, the district court did not make those findings, and therefore, in the view of the United States, it was an error for it to relinquish its jurisdiction over this case. I just want to go through a few of the findings that, in our view, highlight the district court's error here. The district court found that the school district had failed to affirmatively address resegregation in the school district, and that in some instances, the school district had failed to fully look into the issue of quality education for minority students, for instance, not reviewing whether minority students were overrepresented in special education programs or underrepresented in GATE and advanced placement programs, which made it impossible for those minority students to fully participate in magnet school and open enrollment programs in the district. The district court found that the school district had not reviewed its faculty and staff hiring plans, and that the percentages of black faculty in the district had, in fact, decreased over the period of the settlement agreement, and that Hispanic faculty were concentrated in predominantly Hispanic schools. The district court also found that the school district had failed to look into the issue of the disproportionate representation of minority students in suspension and expulsion rates in the school district. So it's our position that, taken together, these facts very much demonstrate a school district which needed continuing district court supervision, and that it was at best premature for the district court to therefore go ahead and relinquish its supervision over the district. The Supreme Court has made clear that it's these desegregation agreements are complicated, that the public is not to be responsible for monitoring them. Yes, it's good for the public to have oversight once a district school district has actually demonstrated that good faith compliance, that elimination of the vestiges of discrimination. But before that point, the district court is needed to oversee a desegregation agreement, such as the one that was entered here. So if this court... Let me ask you, let me anticipate a question that I think the district may raise. Obviously, this is a change of position for the United States. How do you account for that? We would submit that we're not changing our position here. We filed a brief in 2005 stating that, absent evidence to the contrary, that we were comfortable with a grant of unitary status, and that was based upon the facts known to us at that time. In this case, or today, we're just taking a position based upon the facts as set forth by the district court in this case. We're not taking an independent factual view on the facts as presented here. I have not made an assessment of the facts. We have not made an assessment of those facts. I see. But given the district court's findings, it's inappropriate for the court to have gone on and then relinquished its jurisdiction. Okay. Thank you very much. Thank you. We'll hear from the district. Good morning, Your Honors. Heather Gaines, appearing on behalf of the Appalachian Cross Appellant Tucson Unified School District, which I'll refer to as TUSD or the district. As mentioned by one of plaintiff's counsel, this is a case with a long history. On December 19, 2009, 35 years after the complaints were filed, 31 years after the stipulation of settlement, and 5 years after the petition for unitary status, the trial court declared TUSD to be unitary and returned control of the district to the locally elected governing board. In reaching what is a factual finding of unitary status, the trial court had before it thousands of pages of briefs, a memorandum of compliance from the district supported by a statement of facts and affidavits of key district employees, 31 years of annual reports in compliance with the stipulation of settlement, pleadings, petitions, over 45 court orders that had been entered during that 31-year period. It had before it substantial evidence to support the factual finding of unitary status. There are several issues raised in the briefs. Primarily, and the most significant issue in any desegregation case, were the vestiges of segregation eliminated to the extent practicable. This case is unique, as are all desegregation cases. De jure segregation of African-American students had ended in TUSD in 1951, as soon as such segregation became permissive under state statute. The trial court found in 1978 that there had never been de jure segregation of Mexican-American students, and that is a critical issue here. In 1978, when the trial court entered its 250-page order together with voluminous appendices, it found that there were limited vestiges of the dismantled segregated system that were present in only nine of the district's 98 schools. There were no vestiges in the high schools. This was nine elementary and middle schools. The plaintiffs filed a motion to reconsider that order, and rather than pursuing those issues or filing an appeal, the parties got together and entered into the stipulation of settlement, which became the governing document in this case for the ensuing 31 years. In that stipulation, the parties agreed to implement student assignment plans to address the issues found in the nine schools raised by the trial court and to address other schools that were of concern to the plaintiffs. That student, the process of entering into those student assignment plans was pursuant to the stipulation of process that included public participation, plaintiff involvement, court oversight, the court approved all of those plans. And the plaintiffs point out here that those plans depended on voluntary movement, and they did, but there was tremendous public and court participation in crafting those student assignment plans that were then the center of the stipulation of settlement. The district then operated pursuant to those plans for 31 years. And during those 31 years, there was a dramatic change in the district. It was initially, at the time of the trial court's order, 35% minority. As we stand here today, it is actually more than 75% minority. And when we look at the trial court's findings and its unitary status determination in 2009, we have to look at how the parties approached this case during that 31 years under the stipulation. It wasn't a silent case. During the first five years as the student assignment plans were being crafted and were being implemented, the plaintiffs did on occasion appear. They objected to an annual report, and those objections were overruled. They chimed in on the student assignment plans. They were actively involved. After that initial five years, as required by the stipulation of settlement, the district continued to come to the district court year after year, any time it wanted to change student assignment, student attendance boundaries, any time it wanted to open a new school, close a school, substantially remodel a school, add any capacity, implement a magnet program or a theme program, move a magnet or theme program. All of these issues for 31 years were brought to the district court. The plaintiffs had the opportunity to appear, and yet rarely did they object to any of these plans. As I mentioned earlier, there were over 45 orders approving probably 100 different actions, since many of them included, we're going to change this attendance boundary, we're going to add on to this school. When we open this new school, we have to change this. So there was more than 45 actions that were the subject of those petitions, not to mention hundreds of other actions that the district took during that time period that weren't subject to court supervision. And yet in all of that time, the plaintiffs raised two objections that were upheld by the court. One to the closure of one of the district's ten high schools, and one to the reopening of an elementary school as a middle school. So to the extent that the plaintiffs raised good faith here, good faith doesn't mean 100% all the time. No, but the problem you have, of course, is the district court findings. And that's where we start, not from a fresh view of the voluminous record in this case. And we have all those boxes in front of us now, so I know very well of what you speak. But how do we deal with the district court's findings itself as an appellate court? Well, first, I would reiterate that the ultimate determination of unitary status is, in fact, a factual determination. There's precedent for that in Belk v. Charlotte-Mecklenburg. So it's not a matter where there's a finding of fact and a conclusion of law that doesn't follow from those findings. That determination of unitary status is a finding of fact. And I would note that each of the trial court's findings regarding lack of good faith, and I will, relate to the district's alleged failure to assess, monitor, track the effectiveness of its programs. The stipulation, and we argue that those findings are in error. Yes. And I understand that we've reviewed those, and maybe my colleagues will have questions about it. But I understand your argument completely. I'm not going to, I'm not dismissing it by any means. But part of my concern is where we go from here if we hypothetically accepted the district court's findings as, at least, not clearly erroneous. It's a tough standard we have. It's tough to take those findings and then translate those into the conclusions of law. So how do you respond to that? I know your central position is the district court was wrong. And I'm not ignoring that for one second, I want to assure you. But if hypothetically we were to say, well, and we owe deference, where does that leave us? Those findings related to, again, tracking, assessing, monitoring. Not to the substantive implementation. And again, we think it's necessary to look at the plaintiff's actions over the course of this. The stipulation set forth certain very specific obligations. And what the district court, what Judge Berry here clearly found, was that the district had, in fact, implemented the provisions of the stipulation for a five-year period. The tracking, the monitoring, the assessment wasn't an element of the stipulation. How do you know whether or not the plan had been implemented unless it is tracked and monitored? Well, Your Honor, there were 31 years of annual reports. One of the requirements of the stipulation was that the district file an annual report. And it filed those, 31 of them from, there were actually two in the first year and then every April 15th thereafter until April 15th of 2008. Each of those annual reports detailed the racial and ethnic enrollment at each of the schools involved in the student assignment plans. It included a report from the African American Studies Department on that department's activities for the year. It included test scores for the schools throughout the district. This was a huge report. I believe we submitted one into the record because to submit all 31 of them would have been overwhelming for everyone. And so I believe that the district court's findings that these things weren't evaluated and monitored or that we didn't look at them is not accurate. The student assignment plans were implemented. The racial and ethnic enrollments that were included in the annual reports support that. And certainly in 31 years, the plaintiffs never objected. They never said that we hadn't implemented them. Even today... So acutely aware that neither party asked for termination. The court decided on its own to summon everybody there and ask what's going on. And so you were content with court supervision. Everybody was for the time being. But here we are. But it seems like you're awfully close to a court on this. Am I mistaken on that? On the parties? Well, I think that certainly when you look at the post-unitary status plan, the parties did reach an accord as to what they felt the district could do in the future. As Judge Brey ordered and as the district has argued, that's a post-unitary status plan. It's for what's supposed to happen or what we hope will happen after the district is granted unitary status. And, well, we have no... We don't take issue with that. But we believe the district has achieved unitary status and... But I assume, for example, I mean the district I know is going to implement the plan in good faith or intends to. So why do you object to further court monitoring? Because we believe that the district should be in the hands of its locally elected governing board and particularly in times of budgetary constraints where the district's population, I believe it's in the record, has grown smaller and continues to grow smaller every year. The district really needs the flexibility to get its... But that's not an argument you raised initially with the court. I mean, the district didn't go and say, look, we need to, it's now the time has come to end this. It's the court's decision, I suspect, when it got the case and said, this is a 31-year-old case. I've got to get it off my docket. Your Honor, I won't disagree with you that that does appear to be what Judge Brey did when this case landed on his desk. However... Let me finish my quick thought and just a response. And that is, is there a way, and with the assistance of the circuit mediator, that the parties can work through the technical issues involved in this case, in your belief, that would resolve this case in a way that would be satisfactory to everyone? Your Honor... I'm not going to say that I'm not in an unusual posture. The finding of bad faith and the lack of a remedy that your opponents don't want, neither of you are entirely happy with what the district court did. So I'm just asking, and you don't, it will not reflect at all. We decide cases straight up, but I just want to know if that would be of some assistance. And no is a perfectly good answer, don't worry. I think on behalf of the district standing here today, you know, when you represent an entity like that, there's a five-member governing board, and I'll come right out and say that, you know, our marching orders, once Judge Brey entered that initial order and we prepared the memorandum of compliance that was actually presented to the governing board before they voted to move forward with the petition for unitary status, their marching orders are to move forward and get this case over. That being said, I do believe... I understand you're speaking as counsel. You haven't consulted with your clients. Exactly. But I do believe they intend to implement the post-unitary status plan. And I would like to note, at least in response to the appellant's arguments, that anything that has happened since December 2009 isn't on the record. There is no record as to what's happened with the implementation, so I wanted to make that note. And, you know, one other issue they raise is, well, the governing board stepped in and changed the plan to include in it their ability to modify it, and I would like to note, I think this issue is briefed, but the governing board, by doing that, was doing nothing more than stating what is their inherent authority to change documents, policies, regulations, and they felt that it was better to have that in the face of the document so that everyone knew that they reserved that ability. I interrupted your flow of thought, so please continue. That's quite all right, Your Honor. I'm here to answer your questions, as we do believe that all of these arguments have been well briefed, and so returning to the issue of student assignment and eliminating the vestiges, the notion that the postunitary status plan in some way has to get implemented to remedy the past segregation is really a mischaracterization of what's going on here. The stipulation of settlement said what needed to be done to remedy the vestiges of segregation, and that was done. The trial court clearly found, based on the voluminous evidence before it, that CUSD had implemented the student assignment plans for a period of five years and that that had eliminated the vestiges of segregation, and that's where we go back to where this case is different from Green and Dowell, Freeman, Swan v. Charlotte-Mecklenburg, in that those cases found system-wide constitutional violations and imposed system-wide remedies. That wasn't the case here. These were narrowly tailored remedies, and those remedies were accomplished. With regard to the remaining green factors beyond student assignment, the trial court here found that they needed to be viewed in light of the requirements of the stipulation, not in a system-wide sense. With faculty and staff, the stipulation said there was an obligation not to concentrate African-American faculty and staff at any school in the district, and the district complied with that obligation, and they reported on it every year in the annual reports. They had to adopt a nondiscrimination and employment policy. They adopted that policy. There is no issue there. The plaintiffs argue that there was an obligation to hire more minority staff, but that's found nowhere in the stipulation. And in the arguments, both in the lower court and on appeal, there's an issue raised that somehow the district's faculty and staff, the racial and ethnic composition of its faculty and staff should reflect the racial and ethnic composition of its student body, and that simply isn't the law. The Supreme Court case of Hazelwood makes it clear that you look to the applicable job pool, not to the student body when you're making those comparisons. With regard to facilities, another green factor, those were addressed in two places in the stipulation. One, in the student assignment plans where there were certain specific obligations to improve certain facilities as part of those plans. Those obligations were completed. And then under paragraphs 20 and 21, where anything the district wanted to do with its facilities that might have any impact on enrollment and any time that it wanted to open or close a school or build a school, those had to be submitted to the trial court. And as I mentioned earlier, there were dozens of petitions, dozens of orders. But with this level of compliance, why, then, would the district court find that it could not make the requisite finding as to the district court's good-faith compliance with the agreement, whether it had eliminated de jure segregation to the extent practicable? I mean, how do we deal with that finding? Well, ultimately, I believe the trial court did find that the district had eliminated the vestiges. It went on to say that the district had failed to monitor and assess and that that was a good-faith aspect. But Judge Burry, in his August 2007 order, clearly found that the district had eliminated the vestiges of segregation with regard to student assignment, subject to the filing of a comprehensive report on the implementation of those student assignment plans. And the district submitted that report. And in April of 2008, he said that he found the district had eliminated the vestiges and was unitary, subject to showing good faith going forward through the creation of a post-unitary status plan. And in December of 2009, again, by finding the district unitary and entering that ultimate order, he did reach that finding. I won't say that there isn't some confusing and inconsistent language in the trial court's orders, but he reached that decision. And we believe it is the correct decision. And to sum up here, when the trial court finally found the district unitary, he left us with three significant orders, over 100 pages of analysis of the evidence in this case, and ultimately entered the finding. This case is different than other desegregation cases. All desegregation cases are unique. They're dependent on the facts, on the governing boards, on the presumption procedures. This was an active case with lots of involvement. You know, we would note that throughout, from the time the stipulation was entered to the time this case was closed, the Department of Justice, although it certainly received pleadings and we had cordial and frequent communications with counsel, it rarely, if ever, appeared. From the time that the Department of Justice filed the notice in February of 2005 that it had no substantive objection to the petition for unitary status, it never again filed anything in the unitary status proceedings, didn't file the notice of appeal, and in fact opted not to file an amicus brief or any other brief in the scheduled briefing period. And we think that certainly is noteworthy. The same Department of Justice lawyer handled this case from 1977 until his retirement in January of this year. So certainly it's not a case where they were unfamiliar with the facts or the goings-on. In this case, the trial court in 1978 found limited and narrow vestiges of a segregated system and ordered an extremely limited and focused remedy. The parties entered into an agreement to address those vestiges and the district agreed to expand its obligations somewhat to accommodate the concerns of the plaintiffs, and we came to the stipulation of settlement. After 31 years of operation under the stipulation, a time in which the court found on only two occasions that it wouldn't go along with the district's plans for facilities or anything else, the trial court found that the district was unitary. When it entered that finding, it had before it overwhelming evidence of compliance with the stipulation of elimination of the vestiges of segregation and we argue of the district's good faith in implementing the stipulation and its good faith obligation or its intention to move forward in good faith operation of the school district. In 31 years, the private party plaintiffs and the Department of Justice had never raised an affirmative allegation that the district was out of compliance. And the district court did not commit clear error in finding the district unitary and dismissing this case. And we ask you today to uphold that ruling and leave the operations of this school district in the hands of its locally elected governing board where Supreme Court precedent says that it belongs. Thank you, Your Honors. Thank you, Counselors. We have three minutes for rebuttal. Oh, you're going to split that? All right. One each. Very briefly, something happened in 1983. It was Federal funding to this district. Up until now, they've received over a billion dollars and nothing has changed from 1983. That is why the district never wanted to get out of this situation. Number two, I want to make it clear that this post-unitary plan, as far as the blacks are concerned, official plaintiffs do not support it. It is very deficient. It does nothing for black kids. And just to pick up where Mr. Salter ended, we do find ourselves in a somewhat different position in that the Latino plaintiffs believe, again, that if properly implemented, this plan can further quality desegregated education for the students of Tucson. But one thing is very important. I'd really like to pick up on a comment that Ms. Gaines made in response to a question by the court. When asked why the district did not want to remain under court supervision, she started to explain that the governing board wanted flexibility. Well, there is no flexibility when it comes to adhering to the Fourteenth Amendment. And our concern is precisely that, that with respect to the SUI unique amendments that the governing board itself put into the plan without going back to the committee, that give it the right to change the plan. I'm not saying that there can't be changes. We're not saying this is to be written in stone. But the eagerness with which the school district has indicated that it wants out from under is, I think, a cause of significant concern. Given the findings that this Court made, and I think it's very important to recognize that it's not simply an issue, the district court made, that it's not simply an issue of monitoring, but it's finding that the district did not arm itself with information so that it could combat the effects of resegregation of the schools. And that resegregation happened quickly. And we say it was aided and abetted by the district's failure to properly implement its own plans and policies, particularly the one dealing with transfer among schools, where rather than using that policy to further integration, the district permitted schools to become more heavily minority concentrated and permitted a significant number of Anglo students to transfer into schools with the result that those became more prevalent for Anglo students. These kinds of things objected to all along? No, they were not. And to some extent, in fact, I think the fact is that we didn't have the information to know about them. Even in 2004 and 2005, when the district was being asked to disclose information about transfers under Policy 5090, the Minority Slash Ethnic Transfer Policy, it indicated that it had a great deal of difficulty disaggregating the information so that one could tell what was a transfer by virtue of family problems, what was a transfer by virtue of simply seeking to move under open enrollment, what was a transfer to match with a sibling, et cetera, et cetera. So you're saying you didn't have the information in order to make this conclusion, but you have anecdotal information? No. What happened is that for the purposes of the U.S., was it happening all along? And the fact of the matter is that we don't know year by year, transfer by transfer, but that when information was being disclosed for the first time, and the district court talks about this repeatedly, information is finally being disclosed for the purposes of the unitary proceedings. And at that point, when people could get hold of the information from 2004 and 2005, our expert was able to conclude that in 40 percent of the schools within the school district, the schools had become more racially segregated as a result of transfers that were under a policy that was, in fact, supposed to further racial integration. Now, the other point that I would like to make, and I realize I've run out of time in response to one other question, is that if one views the post-unitary status plan as an amendment of the original stipulation of settlement pursuant to Rule 60b-5 and the Rufo case in the United States Supreme Court, that would be a violation of the statute. Then what one has is something which updates the plan to the extent that the – there are problems with the plan and there are issues, for example, that the Fisher plaintiffs have. The court has a document in front of it that it can then consider in the context of what we anticipate and urge will be this Court's decision with respect to the vestiges of discrimination and the findings of good faith. But it does give the Court something to work with and something that meets the needs of today's students. Roberts. Thank you. If the United States want to argue, Ms. Thomas. Thank you. I'll just make a brief comment. First of all, we, since 2005, have not been heavily involved in the facts on the ground which is why we did not file a notice of appeal and took a legal position that was stated in our brief, and I'll just state again that given the district court's findings in this case, it's unprecedented that the court could then go on and relinquish its jurisdiction. Thank you. Thank you all for your arguments and briefing. It's an important case and you've done an excellent job of presenting it all around. We will take it under submission and we'll be in recess for the morning. Thank you.
judges: Gertner, Fletcher B. , Thomas